IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Civil Action No.: 1:24-cv-172

| | |
|---|---|
| KIMBERLY MANTELLI, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | **COMPLAINT** |
| ) | |
| WARREN WILSON COLLEGE, ) | **JURY TRIAL DEMANDED** |
| ) | |
| Defendant. ) | |
| ) | |

## I. INTRODUCTION

1. Plaintiff Kimberly Mantelli ("Plaintiff," "Mantelli" or "Kimberly") brings this action against Defendant Warren Wilson College ("Defendant" or the "College") because the College illegally fired her in March 2023. When Ms. Mantelli confronted illicit sex bias and safety issues at the workplace, she complained about them and threatened to file Equal Employment Opportunity Commission ("EEOC") and Occupational Health and Safety Administration ("OSHA") complaints. In response, the College fired her and, when asked, refused to explain why. But it was obvious why the College made its decision.

2. Plaintiff now turns to this court to be made whole for her harms and losses. Plaintiff brings this action against Defendant for violations of violations of Title VII of the Civil Rights Act of 1964 (Count I), the North Carolina Retaliatory Employment Discrimination Act (Count II), and North Carolina Public Policy (Count III).

## II. PARTIES, JURISDICTION AND VENUE

1

3. Plaintiff Kimberly Mantelli resides in Buncombe County, North Carolina.

4. Warren Wilson College is a North Carolina corporation, with its principal office located at 701 Warren Wilson Road, Swannanoa, North Carolina 28778. It is a private liberal arts college.

5. Defendant's Registered Agent is Ann-Patton Hornthal, with the registered office at City Centre Building, 301 College Street, Suite 400, Asheville, North Carolina 28801.

6. Venue is proper in the Western District of North Carolina, Asheville Division, because: Warren Wilson College has a substantial presence in Swannanoa, North Carolina and conducts a great deal of business in Swannanoa, North Carolina. At all relevant times, Plaintiff worked for Defendant at 701 Warren Wilson Rd., Swannanoa, North Carolina 28778. Moreover, the facts and circumstances of the case arise in Swannanoa. But for Defendant's illegal conduct, Plaintiff would have continued working in Swannanoa, North Carolina.

### III. FACTUAL STATEMENT

7. In or around November 2020, Kimberly began working for the College as an Executive Assistant. She was a valued employee, and her employment was most uneventful for nearly two years.

8. In or around October 2022, Kimberly's boss, Alan Russell, tasked her with taking the lead on contract negotiations for the College's new printer fleet and getting a printing machine repaired that had been broken for approximately two years.

9. This task originally belonged to Print Shop Manager Steve Daigle. He had neglected completing this task even though he was the shop's manager.

10. Daigle's boss, Clarence Tate, later met with Russell to confirm the transfer of responsibilities from Daigle to Kimberly.

11. Kimberly set up a vendor meeting with AbeCarolina, the current vendor for print services at the College and owners of the broken printer, in or around November 2022 to discuss the issues they were having with the printer, the replacement of the fleet, and the renewal of their contract. Kimberly, Tate, and Daigle attended the meeting along with Juliano Buzzita, and Baxter Culler, AbeCarolina's account representatives. Once it began, Daigle suddenly became incredibly hostile towards Kimberly. At one point, Daigle slammed his hand on a desk in anger and walked out of the meeting.

12. After the meeting ended, Kimberly and Tate immediately went to Russell to talk about Daigle's outburst in the meeting. Kimberly found it highly concerning and asked Russell to intervene. Tate expressed that he wanted to write Daigle up over the incident, but Russell didn't believe it would be necessary. Kimberly and Tate then presented the details of the printer contract and Russell approved it. Russell instructed Kimberly to retrieve the contract for his signature. Several days later, Russell became ill and was out of work for two weeks.

13. Due to Russell's absence, Bill Christy, the President of the College, assumed Russell's responsibilities. Kimberly and Tate met with Christy and presented him with the new contract which Christy then signed. Daigle became enraged after he learned that the contract had gone through.

14. In or around December 2022, Russell returned to work. Kimberly informed Russell that Daigle was continuing to be aggressive and hostile towards her and asked if he had

addressed the incident in the vendor meeting. Russell stated he had not and told Kimberly to stop being so emotional. Kimberly stressed that Daigle's behavior was concerning. Russell responded by saying he would talk with Daigle and did not want to hear anymore about it.

15. On or around January 7, 2023, Tate learned that Daigle was having meetings with another vendor regarding printer contracts. Tate informed Russell about these meetings, and asked Kimberly to attend them with Daigle. Russell reiterated to Daigle that Kimberly was the lead on the contract. Russell told Daigle that Kimberly should be the point person in any future meetings.

16. On the day of the meeting, Kimberly arrived to see Daigle had already started without her. Kimberly overheard Daigle discussing ABECarolina's pricing to one of their competitors and shut down the conversation. Daigle became angry and said to the vendor, "See, told you how she is."

17. Kimberly then explain to the vendor she was the proxy for the College's VP and CFO and was the lead on the contract negotiations. The pair laughed at Kimberly, with Daigle adding, "She has no fucking clue what she's talking about."

18. Kimberly threatened to cancel the meeting if they continued to berate and belittle her. Daigle then muttered "fucking females," referring to Kimberly.

19. Fed up with the harassment and illicit bias, Kimberly got up to leave the meeting. She was seated to the left of Daigle against the wall. The only way to exit was to walk past Daigle. Kimberly got up to leave and Daigle blocked her exit by extending his legs out in front of him, making it impossible for Kimberly to leave. Daigle's actions made Kimberly feel threatened, so she called Tate and requested that he come to the meeting immediately.

20. Tate quickly arrived to the meeting, along with the Head of Emergency Management Rick Winsor. Daigle left once he saw them arrive. Tate and Winsor escorted Kimberly to Winsor's office, where she explained what happened in the room with Daigle and the vendor. Kimberly, Winsor, and Tate then went to Russell. Russell ended the impromptu meeting by saying he'd discuss the incident with Heather Shalk in HR and speak with Daigle directly.

21. Russell asked Tate to remain in the office. Tate then requested that Daigle either be written up or terminated and expressed his concerns for Kimberly's safety. After Tate left the meeting, Kimberly spoke with Russell one-on-one and told him in detail the way Daigle referred to her as a "fucking female" and that he tried to block her exit from the meeting.

22. Kimberly stressed to Russell that after that incident, she feared for her safety.

23. Kimberly inquired as to whether her previous complaints about Daigle had been investigated or acted upon. Russell claimed he had not gotten around to it yet. Kimberly ended the conversation by asking him to follow the College's harassment policy and that she would complain to HR directly if he continued to do nothing.

24. Kimberly met with Russell the following Monday to see if he had spoken with or otherwise taken any action on Daigle. Russell said he hadn't. Russell told Kimberly not to be emotional about the situation. He said he would speak to Daigle eventually.

25. When the printer that Kimberly ordered finally arrived, she spoke with Buzzita, who informed her that Daigle was still extremely angry over Kimberly's purchase of the printer. Tate, who was also present when the printer arrived, reported this to Russell and expressed his desire to fire Daigle.

26. Daigle refused to do any training exercises for the new printer. Kimberly reported this

to Russell and also confronted him on not speaking to Daigle after numerous complaints from her and that she believed it to be both an EEOC violation and OSHA violation.

27. Kimberly again expressed to Russell her concerns over her safety and that she would be filing an official harassment complaint against Daigle with HR. Russell confirmed he would speak to HR as well about what her next steps would be.

28. Kimberly was not satisfied with Russell's answer to her complaint. She emailed the President of the College, Bill Christy, and asked to meet with him over her safety concerns with Daigle. Christy refused to meet with her and told her that she needed to follow the proper chain of command.

29. Throughout January, February, and March 2023, Kimberly spoke with Winsor numerous times about her safety concerns. Winsor told Kimberly that he had been emailing Russell, Christy, and Schalk about his concerns over the situation and that he had not received a response from them.

30. Daigle's behavior continued to become increasingly unhinged. Tate informed Kimberly that Daigle had told him that he suicidal. Tate further stated that because of Daigle's suicidal ideations and his anger towards Kimberly, he was concerned for her safety.

31. After her conversation with Tate, Kimberly became increasingly concerned over Daigle's behavior. In one instance, she passed him alone in the parking lot and saw him blasting music and rocking back and forth menacingly in his vehicle. Kimberly reported this incident to Winsor and Director of Public Safety John Davison. Davison was shocked upon hearing this report and revealed to Kimberly that he was never informed of the situation.

32. On or around March 1, 2023, Russell informed Kimberly late in the day that Shalk

wanted to meet with her about the Daigle situation. Kimberly entered the meeting and Russell joined. Russell began the meeting by saying he and Shalk had heard from Davidson and Winsor that she complained about Daigle. They told Kimberly she needed to stop. Shalk then asked Kimberly what it would take for her to stop complaining about Daigle. Kimberly simply asked that her and Russell follow the College's harassment procedures. This comment seemed to enrage Russell and he became incredibly angry.

33. The meeting began to deteriorate after Russell's outburst of anger. Kimberly, sensing that the pair would not deal with the situation themselves, threatened to file EEOC and OSHA complaints, citing workplace safety and sex discrimination. Russell became enraged and violently pushed back his chair and stood up.

34. Kimberly immediately left the meeting and walked over to Christy's office and asked for him to intervene in the situation and stated she would be filing EEOC and OSHA complaints. Despite this, Christy refused to get involved.

35. On March 13, 2023, after the College reopened after spring break, Kimberly went to Russell's office to follow up on the March 1 meeting. Kimberly said to Russell that she wanted something done in regards to Daigle as soon as possible and that if he did nothing, she would file both an EEOC and OSHA complaint. Kimberly then left for the day.

36. Later that same evening, Christy emailed Kimberly, asking her to attend a meeting with him scheduled for 9:00 a.m. on March 14, 2023.

37. Due to an illness, Kimberly arrived to work late on the morning of March 14, 2023. Christy agreed to move the meeting to the following day.

38. On March 15, 2023, Kimberly attended the meeting with Christy virtually. Stephanie

Johnson from human resources and Christy were both in attendance. Christy then terminated Kimberly's employment and refused to cite a reason. When Kimberly asked, Christy simply said he didn't need a reason to fire her.

39. On August 4, 2023, Kimberly filed a charge of discrimination with the EEOC through counsel.

40. On August 28, 2023, Kimberly filed a Retaliatory Employment Discrimination Act OSHA complaint with the North Carolina Department of Labor ("NCDOL") through counsel.

41. On March 19, 2024, the NCDOL issued Kimberly a notice of right to sue letter.

42. On June 10, 2024, the EEOC issued Kimberly a notice of right to sue letter.

## IV. LEGAL CLAIMS

### Count I
(*Violation of Title VII of the Civil Rights Act of 1964*)

43. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

44. Plaintiff is, and at all relevant times was, an employee covered by the protections of Title VII of the Civil Rights Act of 1964 ("Title VII") as defined in 42 U.S.C. § 2000e(f).

45. Defendant had more than fifteen (15) employees at all relevant times.

46. Defendant is, and at all relevant times was, an employer as defined in 42 U.S.C. § 2000e(b).

47. Title VII prohibits discrimination based on sex.

48. Defendant violated Title VII by subjecting Plaintiff to a hostile work environment

based upon her sex.

49. Steve Daigle's sexist comments were directed at Plaintiff.

50. He directed those comments towards Plaintiff because she is a female.

51. Plaintiff engaged in protected activity when she repeatedly complained to management about Daigle's conduct.

52. Plaintiff engaged in protected activity when she threatened to file an EEOC charge of discrimination.

53. Defendant further violated Title VII by terminating Plaintiff's employment in retaliation for her protected activities.

54. Defendant also violated Title VII by terminating Plaintiff's employment on the basis of her sex.

55. As an an actual, proximate, and foreseeable consequence of Defendant's conduct, Plaintiff has suffered lost income, diminution in expected earnings, emotional distress, anxiety, humiliation expenses, reputational harm, and other damages and is entitled to recover compensatory damages in an amount to be determined at trial.

56. Defendant's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. Defendant's officers, directors, and managers participated in and condoned this malicious, willful, wanton, and reckless conduct alleged above. As a result of Defendant's conduct, Plaintiff is entitled to recover punitive damages.

## Count II
### (North Carolina Retaliatory Employment Discrimination Act)

57. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

58. Defendant qualified as an employer under the North Carolina Retaliatory Employment Discrimination Act, N.C.G.S. § 95-241 ("REDA"), at all revanant times.

59. REDA prohibits employers from taking retaliatory action against an employees if he or she "does or **threatens to** . . . [f]ile a claim or complaint, initiate any inquiry, investigation, inspection, proceeding or other action, or testify or provide information to any person with respect to" the Occupational Safety and Health Act of North Carolina ("OSHA"), N.C.G.S. § 95-126 et seq. See N.C.G.S. § 95-241(a) (emphasis added). Retaliatory action includes, but is not limited to: discharge, demotion, retaliatory relocation of an employee, or other adverse employment action taken against an employee in the terms, conditions, privileges, and benefits of employment.

60. Plaintiff engaged in protected activity by threatening to file a safety complaint or initiate an inquiry, investigation, inspection, proceeding, or other action by contacting NC OSHA.

61. Plaintiff further engaged in protected activity by repeatedly making workplace safety complaints to management, human resources, and maintenance.

62. Defendant violated REDA by terminating Plaintiff because she threatened to make an NC OSHA complaint and/or complained about what she believed in good faith to be OSHA violations.

63. As a proximate result of Defendant's conduct, Plaintiff has suffered damages including, but not limited to: lost wages, lost future earnings, severe emotional distress, humiliation, damage to her reputation, anxiety, medical expenses, and other compensatory damages in a

10
Case 1:24-cv-00172-MR-WCM   Document 1   Filed 06/12/24   Page 10 of 13

sum sufficient that subject matter jurisdiction is properly vested in the Superior Court divisions pursuant to N.C. Gen. Stat. § 7A-243.

64. Defendant's actions were done willfully and in a manner that demonstrates a reckless disregard for Plaintiff's rights. Defendant's actions were done in bad faith. Defendant is liable for treble damages. Defendant's officers, directors, and managers participated in and condoned this willful, reckless, and bad faith conduct.

## Count III
### *(Wrongful Discharge in Violation of Public Policy)*

65. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

66. Plaintiff was an at-will employee of Defendant.

67. Defendant employed at least fifteen (15) employees at all relevant times.

68. The public policy of North Carolina, codified in the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.2(a), seeks to protect and safeguard the opportunity and right of all individuals to "seek, obtain, and hold employment without discrimination" on the basis of race, religion, color, national origin, age, sex or handicap.

69. Defendant violated the public policy of North Carolina as set forth above by terminating Plaintiff because of her sex.

70. The public policy of the State of North Carolina, as set forth in REDA, prohibits employers from taking retaliatory action against an employee who reports safety and health concerns or threaten to make such complaints with OSHA.

71. The public policy of the State of North Carolina, as set forth in the Occupational Safety and Health Act of North Carolina, N.C.G.S. § 95-126 ("OSHA"), prohibits employers from taking retaliatory action against an employee who reports safety and health concerns or who refuses to engage in conduct that would violate said statute.

72. Defendant violated the public policy of North Carolina as set forth above by terminating Plaintiff because she complained about workplace safety and health concerns and/or threatened to file an OSHA complaint.

73. As an actual, proximate, and foreseeable result of Defendant's actions, Plaintiff has suffered lost back and front pay, lost benefits, diminution in her earning capacity, severe emotional distress, damage to her reputation, anxiety, depression, embarrassment, humiliation, and her peace of mind has been disturbed.

74. Defendant's actions were done maliciously, willfully, wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights. Defendant's officers, directors, and managers participated in and condoned this malicious, willful, wanton, and reckless conduct alleged above. As a result of Defendant's conduct, Plaintiff is entitled to recover punitive damages.

**JURY TRIAL DEMANDED**

WHEREFORE, the Plaintiff prays the Court to:

1. Enter a judgment against Defendant and order Defendant to pay Plaintiff damages for all harms and losses;

2. Award Plaintiff punitive damages pursuant to N.C. GEN. STAT. § 1D-1 *et seq.* and 42 U.S.C. § 1981a *et seq.*;

3. Award Plaintiff treble damages pursuant to N.C. GEN. STAT. § 95-243;

4. Award Plaintiff all reasonable costs and attorney's fees incurred in connection with this action;

5. Award Plaintiff such other and further equitable relief as the Court deems appropriate under the circumstances; and

6. Grant Plaintiff a trial of this matter by a jury.

This the 12th day of June, 2024.

*/s/ Sean F. Herrmann*
Sean F. Herrmann
North Carolina Bar No. 44453
Kevin P. Murphy
North Carolina Bar No. 41467
Herrmann & Murphy, PLLC
400 Clarice Ave.
Charlotte, North Carolina 28204
Phone: 704-940-6399
Fax: 704-940-6407
Email: kevin@herrmannmurphy.com
Email: sean@herrmannmurphy.com
*Attorneys for Plaintiff*
